Good morning, Your Honors. My name is Gary Dupkoff. I'm here this morning on behalf of Mr. Woods, along with my co-counsel, LaFrya Margolin, and our paralegal, Donald Miller. I'm going to track the order of the issue. I didn't realize that Mr. Manther hadn't made the scene yet. Okay. So all I've done so far is make my introductions, and as I said, I was going to track the order of the issues in the brief. Now, Judge Selma, you were a bit of an unknown commodity to us, so I did what any barely competent appellate attorney would do, and did some background checking, and saw you were a student of history in your youth, and what I'd like to do is just begin with a general historical note on the ex post facto claim before I descend into the specifics. This was a tack we took below in our pleadings in the district court, but because of the page lengths in the appellate briefs, we didn't emphasize it as much, but the point I'd like to make is... Can you speak up just a little bit? Sure, I can, Your Honor. And maybe slower, too. That's my New York background, and I will speak slower and louder. The point I want to make is the crucial importance of the ex post facto clause to the framers. The clause, as we all know, is in the body of the Constitution, not in the Bill of Rights, and the reason that is is because of the paramount importance the framers placed on ex post facto issues, and what I'd like to... The way I would like to put this case into context is it addresses the core concerns of the ex post facto clause. I have a quote from Landgraf v. USI Film Products, which is a Supreme Court case from 1994, and what the court said there was the following, the legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals. And I would suggest to the court that's exactly what we're dealing with here. We're dealing with the most, perhaps the most unpopular group imaginable, which is a class of inmates who have committed serious crimes, and the legislature in California in fact responded to political pressures as they saw those and passed legislation that retroactively imposed harsher punishment on the inmates who were already incarcerated. But didn't the California legislature acknowledge the historical importance of the ex post facto provision by putting a corrective provision in the 1977 statute in section 1170.2c? There's no question but that there is a statutory recognition of the fact, as Your Honor just pointed out. So we're talking exclusively as applied? Well, that's correct. That brings me to what I was just about to say, which is no court has yet done an historical analysis that we're asking this court to do of the way that the system has been applied through the years in California. This was the point that was gleaned from Garner versus Jones that made it absolutely clear that historical analysis is the second of two ways to challenge an administrative state system such as this. And, you know, I've covered all the bases that I could think of in the briefs. The numbers are stark. They speak for themselves. And I'm not going to revisit that absent any questions. What I would like to point out, however, is that there were substantive changes made between the determinant sentencing act system that came into effect and the indeterminate sentencing act provisions that they replaced. And no court has addressed the substantive changes. So on top of, you know, the numbers and the as applied analysis, there are these substantive changes I would just like to quickly list. And one of them I stressed in the briefs is the reversal of the hierarchy of criteria. The courts that have said, oh, there's been no retroactive change or punishment we need to worry about because the ISL system required a review of multiple factors and the DSL system required a review of multiple factors and so what's the problem? But the problem is clearly the hierarchy has been reversed. The case of the ISL cases make absolutely clear it's rehabilitation, individualization. What can we do to help this inmate rejoin society safely? As we know by statute under DSL, it was punishment and punishment alone that became the lodestar. I don't think anybody is going to disagree with the grand purpose of the ex post facto clause, but the real problem here, it seems to me, is what it means as applied in this case. As the district court noted, and I have shared some of the same concerns, so I'm going to ask you the question I'm going to ask. As I understand what the Supreme Court has instructed, one has to show that there is a substantial risk of increased punishment for the petitioner's particular offense. Here, you've made a significant showing, a statistical showing of what's happened overall, but at least I can't find anything in there which shows that this petitioner's Unlike the Third Circuit, where it was quite specific to that offender's exact situation. So my question is, have I missed something? If I haven't missed anything in the record, then how do you get over that hurdle? I have several responses to that point, Your Honor. First of all, it's somewhat ironic that the district court did to us exactly what the parole board did, which was to set an impossible condition that we couldn't meet. And what it found, and in the words of the district court's order, Woods did not provide evidence of similarly situated prisoners who were paroled under the ISL, which I believe is somewhat the point Your Honor is making. And we specifically asked for that in discovery and were denied it. So here, the district court denies our request to get parole grants under the ISL system and then faults us. Well, wait a minute. I'm talking about his particular offense. Well, that's what the court meant by similarly situated inmates. So we were denied discovery of parole grants to kidnappers under the ISL system. How many people are there who kidnap 23 children on a school bus? Right. Well... His crime seems to be very unique. It's unique. Right. And is he to be denied parole? No. No. I'm not saying that's an answer. I'm just saying that maybe that's rational for denial of that discovery question. Obviously it's unique and there's nothing in that we could say an argument against that. The point, however, is that if all of the inmates, or one of the points, if all of the inmates are being prejudiced by the changes in the application and the as-applied system and in the substantive changes brought by DSL, then he is being prejudiced as well in his focus on this one particular inmate. That's where the problem is. The statistics only get you so far. Because he could be the most heinous offender in California history, and the parole board surely can take that into account. What I'm saying is the record is devoid of any indication that he would have come out of parole hearing differently under the pre-DSL regime than he came out of it post-DSL. Okay. Looking at the specifics in the record, one thing we know under the ISL system is that he would have been given a parole date at his first parole hearing. The Dannenberg, the recent decision in the Supreme Court in Dannenberg, makes that absolutely clear when it references the old Supreme Court case, In re Rodriguez. In re Rodriguez, in 1975, mandated that the parole board set a primary term and they do so promptly. In response to that, the board or the adult authority, as it was then called, promulgated regulations or a bulletin or whatever to enforce what In re Rodriguez was ordering. So he, that's what, he's already lost the ability to have a parole date set at his first hearing, wholly apart from suitability. And I know Your Honor is still concerned I'm not addressing the question, but here's the kicker. There were matrices. There were matrices that showed what were the appropriate ranges, and admittedly they were discretionary. But when you look at the numbers in the matrices, and this is in an exhibit we appended to our ex post facto memorandum down below, you'll see that the numbers, and it's also revealed in the discovery. In my discussion of the discovery we received, the numbers are of a totally different order, and it's across the board. So if you want to cut out, Ms. Here's a number different for him. I can't make heads or tails of these numbers, so that's why I'm just kind of asking you for help. Well, what the numbers show is, you know. Overall. I grant you that. Even I can figure that out from the tables, but what I can't figure out from the tables is how it plays out with respect to somebody who did what this guy did. Okay. With the focus on what this guy did, of course when the court's asking that question, we've eliminated everything else from the calculus. No, I'm not, and neither did the parole board. Well. But I am saying that that's where you have to start, with what this guy did and how, and where he ended up as of 2000. Okay. So if you start with what this guy did and where he ended up, how do I know it would have been any different, let alone substantially different? Okay. And again, you know, I guess my only response to that is as a member of a group, every one of whom was substantially, had his incarceration terms substantially increased, we know he was a member of this group. And I'll just point out there was a recent district court case following Nickens in the Third Circuit that adopted that very same reasoning, where there was a change at issue and the AG argued that there was no, but that's one response. And the other response is that the court's referenced the most heinous offense, you know, in history, and that's the reason he's in a class by himself. If you look at the facts of the offense, you have to look at it in terms of the decision the board was making in 2000. And what the board had to decide in 2000 was he, was there an unreasonable risk of safety to the community were he to be released in 2000? And when you look at, you know, the heinousness of the offense, you can't stop there. You have to ask yourself the question, or the board had to ask itself the question, well, what's the nexus between that heinousness in 1976 and his parole risk in 2000? And there was no nexus between the... Well, the board, maybe not an adequate one in your view, but the board did say, look, he's only recently come even in part to accepting the notion that what he did could have actually harmed these folks and harmed them forever. And what we want to do, we meaning the parole board, want to do is to kind of have a level of assurance before we spring you, which you're very close to, it said, you're very close to, before we spring you, we want a little higher level of assurance that you've now got that concept, so you're therefore unlikely to repeat it or anything similar. Okay. Well, there are two problems I see in that. One of them is it assumes the good faith of the panel, which ignores our third claim, which establishes, I believe overwhelmingly, that they were enacting in good faith and they were just, you know, issuing an order that was predetermined. And on that subject, I would just add that there's a federal district court now that's ruled that there was an illegal no parole policy and it's in the Eastern District of California, Coleman versus the board that's currently on appeal and briefs are being filed as we speak. So... Well, it was actually, isn't it commentary to a statute, isn't it commentary to a funding statute or a funding decision by the state that they recognize that there isn't this no parole policy, so why should they be funding the parole board? I don't understand the court's question. All right. Commentary where? I'm not quite sure where it is, but... Legislative analysts. Legislative analysts. Right. And determining how much money to give the parole board said... Right. So that's right. There's no parole policy. That's right. So there's that, but there's also, it was factually incorrect to say he's only recently come to terms with this. If you recall, in 1983, an evaluator said he was an above average risk for parole, you know, 20, 17 years earlier. So it's the board imposing its findings on a record that doesn't support it, which is our due process, some evidence claim. He had been accepted in responsibility and had gone through Category X years and years earlier and the unanimous opinion of every professional, every CDC professional that ever looked at him was that he was ready for parole, supported by the people that knew him best. We've pointed this out in the briefs, the trial judge, the investigators, his family, his community. So I just disagree with the factual predicate of that. I think that was an excuse or a pretext that the board, you know, put over the facts as they were in the record to justify what we claim is unjustifiable, and I'd like to save some time for... But I certainly would like to... So it said it was denied in 2000. He gets another hearing in a year. Did he have another hearing in a year? Yes, he did. And it was denied as well. This is not... There may be some indications of this. I understand before, but I'm just wondering, so are they entitled to a hearing every year? As a matter of law, I believe they are. As a matter of practice, it doesn't happen every year. And with that, I'd just like to save a few minutes for rebuttal. Thank you. Sure. Mr. Matthews? Good morning, Your Honors. May it please the Court. I'm Scott Mather, Deputy Attorney General, counsel for appellees. I'd like to start with some of the general comments regarding the parole statute and move to the more specific arguments. Counsel at length discussed the difference between the ISL and the DSL and the provisions and how it's changed by its enactments, how the Board now looks at parole compared to how it used to look at parole. However, counsel also makes clear in this case that he's not making a facial challenge to these statutes. He's making an as-applied challenge. And thus, the Court, as I also anticipated being asked, has raised numerous questions about how it applies specifically to him. And just as a note, one of the issues that counsel also presents is the declining rates in parole, and that this hasn't been considered as well, although it is, that claim in itself would be separate from looking at his specific circumstance and how parole has been applied. Well, what he's, I mean, at least as I understand it, what he's saying is, look, I presented statistics which show that there has been a marked decline in the number of, or increase in the number of denials or decrease in the number of grants. That's what everyone wants to look at. There's been a huge change before and after. And from those statistics, he can reasonably infer that Woods was caught in the sweet. And what's wrong with that line of reasoning? Two things, Your Honor. The first, as a general premise, in arguing that the Court hasn't looked at these declining statistics, according to Appellant's own statistics, by 1989, the parole grade grant had dropped to around 1 percent, yet this Court's decision in Connor, the decision that addressed the facial validity of the change in sentencing structures, was issued in 1992. The issues of the declining parole grants and whether on its face that constituted an No, but that's, that's not quite my question. My question is, he's put in statistics which show across the board, overall, there's a big difference between pre-DSL and post-DSL, right? Right. Yes, Your Honor. Okay. And the statistics show what the statistics show. And so he's saying, look, there's so, the statistics are so overwhelming, and they are across the board, that from them, you can reasonably infer that Woods was caught in the sweet, even though they have nothing specific as to Woods or Woods' offense. Nevertheless, they're suggesting it's reasonable to infer. You've raised a tribal issue, put differently. Well, Your Honor, as the district court noted, based on the statistics, based on the comparison that I've gone and done, it is possible to speculate that he might have been granted parole earlier. However, it isn't possible to show that there's a significant risk that he now currently faces a longer period of incarceration under the ISL. But wouldn't the statistics support a general inference that there is a policy affecting everyone? I don't think the statistics would show that there's a policy affecting everyone. In fact, Court in Rosenquantz, one of the things it addressed, and that was a California Supreme Court decision addressing ex post facto in part, was it noted that when inmates come to prison, they don't have an expectation or a right that their parole is going to be decided by the same type of individuals who are making the decision at that time. In fact, the decision makers may become more conservative, more judicious. So the fact that the parole boards now may less frequently grant parole can't be attributed just solely to a change in the sentencing laws. It could be, and this is equally speculative, but it could be that they are more conservative. Well, it could be political, who's the governor and who the appointees are. There's a lot of reasons why the commissioners may be more conservative. As Your Honor points out, appellant suggests that it's a bias. He also argues, on the other hand, it's attributable to the change in sentencing laws. But this only underscores the speculative nature of his ex post facto claim, because at one point, even in his argument heading, he says that his parole denial cannot be explained on any other basis than this bias. And yet, if that is true, if that's his claim in this case, then he's really attributing his parole denial to a biased or a more conservative board, rather than some change as affected by sentencing laws. And all of this, I believe, somewhat confuses the issue and makes it, as the district court found, when you have to look at this, you can certainly see grounds for speculation as to whether or not he is serving longer under the current scheme as it specifically applied to him. But you can't make the type of showing that he's required to make. And it's also substantiated by the discovery that he was allowed to conduct. He was allowed to conduct discovery of a year's worth of parole decisions. And in his Ninth Circuit briefing, he refers to one other kidnapping case. But the court may not just stop at the discovery and his briefing on that, because he also includes a California Court of Appeal decision, People v. Schoenfeld, which dealt with this crime. And that was a 1980 decision, and the court in that case noted this wasn't unprecedented mass kidnapping. There aren't comparable offenses to kidnapping 26 children ages 5 to 15 out of a school bus and keeping them in an underground structure, an underground vehicle, in a hot summer afternoon, hoping that they're going to be rescued or wondering, as the record shows, the children were wondering if they were going to die. This just isn't the type of offense to which he can show the board would have taken one of the most notorious kidnapping cases in California prior to the sentencing change and would have paroled him. You can only speculate that that may have been the case. But suppose there was a policy, in fact, to deny parole across the board. To me, this is somewhat akin to an antitrust case conspiracy. Rarely do you get the letter adopting the conspiracy. Rarely do you get people to testify, I was at the meeting. You've got to prove the agreement through inferences. And don't the statistics here at least provide a basis to infer that there was an agreement to drastically reduce the availability of parole? No, I don't believe the statistics show there was any sort of agreement to reduce the parole. Based on the facial changes to the sentencing schemes, the board is required to look at the commitment offense. And they may frequently deny parole, and more frequently than before. But the fact that there was a low relative percentage of parole grants isn't in itself sufficient evidence. I guess an inference could be drawn in to answer your question. I guess it's possible to infer, but it's a speculative inference. But isn't that significant on summary judgment as opposed to final adjudication? I mean, if you can draw the inference that it's simply the change in the factors where you can draw the inference from the statistics that it's a policy, doesn't that leave us with a tribal-issued fact? Well, no, Your Honor. And in the context of this case, the respondents' proceedings in the district court wasn't titled as a motion for summary judgment in their answer. But typically, even though the court looks at the answer, determines from the answer in the pleadings, the case, that this isn't a matter that would ordinarily move on to trial. The district court could, in its discretion, decide to hold an evidentiary hearing. If there were evidentiary issues in dispute, here the evidence really doesn't seem to be in dispute. Nobody disputes what occurred at the parole hearing. Nobody really indisputes the parole percentages. It's a matter of applying a law and determine, based on those facts, is there a violation. And the bias claim in this... Suppose there actually is an unwritten rule, like the legislative analysts referred to, where there's not going to be any parole. Wouldn't that, if you could discover that and put that into evidence, wouldn't that create a very strong inference that this petitioner was being effective adversely by the new system? Your Honor, if you could make such a showing under a particular type of case, that might be useful. This case, however, even though he has submitted that evidence in his appellate briefings, the declaration, the analysis, when he was before the Board, he was presented with the opportunity to express whether he had any objections or reservations about that very issue. The Board informed him of his right to an impartial hearing panel, asked him if he had any objections. Mr. Woods stated no. Other inmates have not answered in this way. Other inmates have indicated they have objections. But even more importantly, what the district court noted is, even if there's this general bias out there that may or may not be provable, under the facts of this particular case, he did receive a full, thorough, detailed hearing. The Board looked at both, not only the negative factors that would support his decision, but also considered all the positive evidence in favor of his parole, allowed Woods to speak as to each of those issues and discuss them at the hearing and give closing statements before making his decision. So the district court found that, even if there is a possibility of bias, which the court didn't believe was substantiated, in this particular case, the Board didn't have to look to bias to make its decision. There was more than sufficient evidence in the record, in this case, to support a parole denial, based on the crime, based on all the circumstances that the Board considered. And so the claim of bias, while it might retain a potential claim for other litigants, in this case, it's not only been waived at his hearing, but the Board's decision demonstrates that there was, in fact, some evidence and that the decision was based on an individualized look at his suitability for parole and then supported by overwhelming evidence in the record with regard to the crime as well as other evidence to other suitability factors that the Board considered. Whatever happened to the holding or the observation in Stanworth of the California Supreme Court that a prisoner's release date could be calculated under either the ISL or the DSL with him getting whichever is the most beneficial? You know, I'm not aware of and I don't think it was briefed by the parties in terms of looking at the issue and the different statutes I simply left it where the Court had left it in Connor and looking at these statutes and saying okay, on its face there may be some differences but they're not differences that would constitute an ex post facto violation and I guess that's even more significant in the context of this case because we're not looking at a facial challenge any longer it's not being raised specifically by Woods in this case in fact, he notes in the district court briefing that respondent initially cited cases that were dealing with the facial nature of ex post facto and when he filed his response to that, his opposition he said, well, I'm not asserting just a facial ex post facto challenge I'm asserting an as applied challenge I should be able to show my cases are different Before the board, is it possible for someone to say, hey, hold on a second you've got to calculate my eligibility for parole under the ISL regime because that's when I committed my offense I don't believe that is the case, Your Honor and recently the California Supreme Court in Vandenberg looked at the California parole statutes, granted it was a proportionality of terms, but in reaching that issue, they also construed the statute and the various regulations regarding parole terms, and they said it is a two-step process you first determine if somebody's suitable for parole, and then if you find them suitable for parole Not my question, maybe I didn't say it very clearly Is it possible for a prisoner before the board to say you must calculate my eligibility for parole under the ISL regime rather than the DSL regime No, Your Honor, I don't believe it is I'm not aware of any legal authority that would allow somebody to make that request, and I guess that's the purpose of the claims in this case is whether he could show that there's an as-applied violation such that he would be entitled I just find it rather curious that somebody can roll the dice and wait around and see what happens without giving the board a shot first, and so you're saying that that's not an available option The board currently reviews the suitability solely under the current guidelines I understand that, and it's not my question My question is whether, and you have answered me that it's negative An inmate cannot make a pitch to the board but because his offense was committed before the DSL regime was adopted he should have his parole determined based on ISL principles That's correct, Your Honor I also want to address the Court's questions, too and the Court drew a comparison earlier to the decision in the Third Circuit in which they had addressed and found an as-applied explosive factor challenge, and I just wanted to note how dissimilar the two cases are because Mr. Royce doesn't rely on that case In the Third Circuit case, which was the Mickens-Thomas v. Vaughn case, the district court had noted that under the structure that was at issue in that case the board had granted parole in every single case to an inmate who was suing a commuted life sentence After the statute was changed, however, the particular litigant in that case was denied parole So the court in that case didn't have to speculate about whether it was more likely or less likely that he would have been granted parole under the old system. They could simply, in that case, look to the old system and note that in 100% of cases inmates were granted parole Now, while Woods notes that many inmates under the old system here were granted parole, not necessarily all were, and what makes this case further speculative and the crux of the district court decision was this was, as the California Court of Appeal found, an unprecedented mass kidnapping Woods, in his discovery, points to several cases talking about the inmates in their stages of rehabilitation, trying to draw comparisons to his, but he isn't able to find any cases with a crime with as many counts of a kidnapping offense He refers to a single case, a kidnapping count in which there was one count, and other crimes in which there was maybe one or two counts Based on the lack of any comparable cases, much less the amount necessary to prove his claim he can only, as the district court found, speculate Well, which way does that cut? That just means he can never prove it and has applied challenge, right? He can never He can never prove a comparable offense. He can look at the other factors which is part of the equation such as he has the rehabilitative efforts to compare those but it's speculative, as the district court noted at this point, because the board never had to face this Does that mean he can never prove an as-applied challenge? Yes, Your Honor, I would say that Woods cannot, in the context of his case, prove an as-applied challenge Well, that can't be And there's nothing that requires that he I mean, can it? Are you saying that there are categories of offenders or offenses where the person simply has his hands tied going in and can never prove that as applied to him, there's an ex post facto violation? Yes, it may be if there are cases that there's not a comparable case to review under the prior sentencing scheme to determine how the board handled those cases to an extent, he can show he can't show the significance So even if there's an ex post facto issue with respect to him, he's stuck Is that the State's position? Well, Your Honor, he's stuck He's stuck for two reasons. The facial challenge he could bring up, but the court's decided Just now told me that he can't conceivably win it He can't prove an as-applied ex post facto violation His defense is so unique that he can't show what the board Regardless of whatever he does in prison to rehabilitate himself or whatever he could be denied parole forever, simply because his case was unique and That's not true That's the way the statute reads now Under the ex post facto test, he could show that he's being denied due process and that the board lacks some evidence to deny him parole and I guess I should retract my prior statement I was thinking in the context of this case that there's nothing he can do currently to prove an ex post facto violation because of how gracious his offense is I guess conceivable at some point and I don't even know if this would be a proper basis because it wasn't raised in this case but over the length of incarceration he's claiming this was his 10th hearing but at what point has he become is he able to draw a comparison between other cases The problem in this case is he has a type of crime that's unprecedented so at what point can the board no longer rely on him? What in the world does that have to do with anything? It may have to do with the board's denial but with his ability to reach in and find something analogous I can think of a bunch of them out of the newspaper that are notable in very much the same way so you're saying because there was no other person who kidnapped 27 people including 26 kids and put them in a van underground for 17 hours before they managed to get themselves out of the mess he put them in that it is impossible for him to prove an ex post facto violation? I mean that's what I hear you say And perhaps in the way I've stated I've overstated he doesn't have to show the exact type of crime a crime that was similarly heinous So if he doesn't have to show exact what does he have to show? A crime that's similarly heinous to his and show that the board That's just words I mean Well I guess Give us a type of crime that's similar to what he did Well As a As a matter of hypothetical I would envision a crime that if it was a kidnapping offense would involve a number of kidnappings maybe a number of murders a crime that wasn't explainable by a motivation for money like a kidnapping offense in this case was admitted during the board that he didn't need the money that this crime was committed just to gain further money So I mean there's a lot of circumstances I focus on the exact nature of the crime and that's only as your honor's point that's only part of the analysis it's also his rehabilitative steps and he has demonstrated many steps towards rehabilitation as the board noted but there are also other problems that the board has also found with regard to suitability for parole The board had a large concern with the fact that he hadn't taken any further participation in self-help and therapy groups over the last couple years and Mr. Woods acknowledged that at the hearing but didn't indicate that there were no such further groups available Your time has expired so you might want to wrap up I'd just also like to note about why Woods has been denied parole in the future at subsequent hearings as counsel noted those hearings also dealt with new facts he was for instance This is not in the record the question was very simply answered he's had subsequent hearings and that was referenced in the answer if the court cares to look at the particular of those hearings but in summation given the unique and unprecedented nature of his crime the fact that he despite making very good efforts at rehabilitation and prison the board still found that there were some aspects of his programming that made him unsuitable for parole he cannot show as a matter of comparison that he would have been able to help Your time has expired so you might want to wrap up That means stop Thank you Your Honor Mr. Dukoff I want to address Judge Reimer your main point and I'm going to conclude on that but I'd just like to touch on a few of the other points that were raised by the court Judge Wardlaw you made a comment you suggested to counsel that maybe the shift was due to political appointees or a new governor or something to that effect and my adversary suggested well then it's just speculation to tie it to the change in the legislative regime but the legislative regime that replaced it specifically mandated that the new principles be applied in parole decision making and that's how we know that it's not speculation it's not just a shift in political fortunes and that's California Penal Code section 1170.2b that I discussed at page 25 of my opening brief Judge Reimer Stanworth question just to be clear Stanworth was addressing the term setting function of the parole board and of course Mr. Woods has not reached that point because he hasn't had a term set ever and that's the point I wanted to make about Stanworth about Mickens-Thomas we're asking this court to follow the lead of the third circuit I know that my adversary has attempted to distinguish it on its facts and Judge Reimer you noted how stark it really was in that case the relationship of the statistics to the individual case before but there's been if you shepherdize Mickens-Thomas in all of the cases that apply within the third circuit of district court cases that come after it you see that they recognize that Mickens-Thomas expressed a broad principle and that they apply that broad principle in cases that aren't you know as stark as the Mickens-Thomas facts the last point that the counsel made about the other problems cited by the board and his failure to participate in self-help programs we completely have addressed that in the papers below there were no other self-help programs it was just a myth and finally about the specifics of how do we know what the ISL regime would have done for Mr. Woods back then first of all there's no requirement of certainty we don't have the burden to show of course that he certainly would have been paroled by now our job is to show the substantial risk number two what we have shown definitively I believe is that under ISL he would have had a term set that much we know he's lost in their failure to apply ISL to him and if you look at all of the contemporary matrices that are supposed to guide the board or the adult authority in setting the term in 1975 it was promulgated in 75 but applicable in 76 you'll see that they are far far shorter than anything that has been going on under DSL and the point under DSL is that Mr. Woods is never going to get paroled because the facts of the offense will never change and as I was trying to say before there has to be some kind of nexus some suggestion I have trouble with that because what you argue is that you can't you can't forever rely on something that's always going to continue that's correct but but when does that point come and why not? because the nature of the offense is always going to be important isn't it? yes and the nature of the offense will be more important in cases where there is that connection between what happened in the offense and a determination of the fellow's current parole suitability so for example if he was in a gang when he committed the crime 26 years ago and the crime was was a derivative of the fact that it was a gang related crime and he's still in the same gang that would be a case and he refuses to give up his gang membership that would be a case where you know the facts of the offense could be carried on until he stops being this gang member if he did it under the influence of alcohol and for 20 years in prison what about a serial rapist? well then there would be psychological evaluations and the board would rely on the professionals and in this case don't forget there was a professional psychological evaluation prepared the evaluator understood all of the circumstances of the offense and he found that he was a low parole risk and that the parole decision ought to be made based on other factors which of course led the board to rely on exactly what the evaluator told them not to and with that my time has expired if there are any other questions thank you counsel for your argument the matter just argued to be submitted and the court will stand at recess for the day
judges: Rymer, Wardlaw, Selna